


# HOME EQUITY LINE OF CREDIT AGREEMENT
## AND DISCLOSURE STATEMENT

**Agreement Date:** March 26, 2024
**Borrower(s):** KERRY ANN HANSON
**Property Address:** 5976 REACH ST, PHILADELPHIA, PENNSYLVANIA 19120
**Lender:** loanDepot.com, LLC
**Credit Limit:** $53,900.00
**Maturity Date:** March 26, 2054
**Initial Interest Rate:** 10.625%

## 1. Definitions.

(A) The pronouns "you" and "your" refer to all Borrowers signing this Agreement, jointly and individually, and each other person or legal entity that agrees to pay this Agreement. "We", "us" and "our" refer to the Lender, or any person or legal entity that acquires an interest in the Line of Credit.

(B) "Account" means an account you carry with us. The initial Account Number is Loan Number stated at the beginning of this Agreement.

(C) "Account Balance" means the sum of the unpaid principal balance advanced under the terms of this Agreement, finance charges, fees and other charges that are due, and other amounts advanced to you or others under the terms of this Line of Credit.

(D) "Agreement" refers to this Agreement, and any extensions, renewals, modifications or substitutions of it.

(E) "Billing Cycle" means the interval between the days or dates of regular periodic statements.

(F) "Credit Limit" means the maximum amount of principal we will permit you to owe us under this Line of Credit, at any one time. Your initial Credit Limit is stated at the top of this Agreement.

(G) The "Draw Period" begins on the Agreement Date and is the 3 year ( 36 months) period during the term of this Agreement that you may request advances.

(H) The "Interest Only Period" begins on the Agreement Date and continues for 120 months. You will be required to make payments during this period as outlined in this Agreement.

(I) "Line of Credit" refers to this transaction generally, including obligations and duties arising from the terms of all documents prepared or submitted for this transaction such as applications, security agreements, disclosures and this Agreement.

(J) "Minimum Advance" means the smallest amount of money we will advance to you at your request.

(K) "Minimum Payment" means the minimum payment amount required under the Minimum Payment section of this Agreement.

(L) "Payment Due Date" is the payment due date as provided on your periodic statements.

(M) "Property" means the real property that secures your obligations under this Line of Credit.

(N) The "Repayment Period" begins immediately after the Interest Only Period and continues for 240 months. You may not request advances during the Repayment Period.

Other important terms are defined throughout this Agreement.

## 2. Account Request, Promise to Pay and Security Interest.

You promise to pay us on our order, at our address, or at such other location as we may designate, so much of the Credit Limit as may be advanced under this Agreement, plus finance charges, fees, charges, costs, and expenses as described in this Agreement.

As stated later in this Agreement, we will apply all payments and credits in accordance, with our standard operating procedures and with the requirements of applicable law.

If we have extended you credit over your Credit Limit, the amount over your Credit Limit will also be due in addition to your Minimum Payment. There may be other charges described in this Agreement that you will be obligated to pay. You agree that our books and records will be sufficient evidence of your obligations to us under this Agreement.

We have secured your obligations under this Line of Credit by taking a security interest (by way of a separate security instrument dated March 26, 2024) in the Property located at: 5976 REACH ST, PHILADELPHIA, PENNSYLVANIA 19120. Property securing any other loans that you have with us may also secure this Agreement.

**3. Advances.**

You may request advances by the following methods, to the extent the means is allowed in your state or jurisdiction:

- Wire / ACH

We will record the amount as an advance and increase your Account Balance. You may only request advances during the Draw Period. You may not request any advances during the Repayment Period.

**4. Advance Limitations.**

We do not have to make any advances during any period in which you have a right to cancel. Your ability to request and access advances is also subject to the following additional limitations:

You must request and obtain an initial advance on the Agreement Date equal to at least 75% of the Credit Limit. No additional draws may be taken for ninety (90) days following the Agreement Date. Funds will become available to re-draw as you make payments during the Draw Period. Additional draws must be in an amount equal to or greater than $1000 and will only be granted if there is credit available on your account. Draw requests will not be granted during the Repayment Period.

**5. Minimum Advance.**

You must request and obtain an initial advance on the Agreement Date equal to at least 75% of the initial Credit Limit. State requirements may impact required draws. No additional draws may be taken for ninety (90) days following the Agreement Date. Following this ninety (90) day period, you may request additional draws in minimum amounts of $1,000 or the applicable state minimum, whichever is greater.

**6. Credit Limit.**

The initial Credit Limit will be no less than $50,000. Subject to the terms and conditions of this Agreement, you may borrow on this Line of Credit up to the Credit Limit. You agree not to request or obtain an advance that will cause the unpaid principal of your Account Balance to exceed the Credit Limit. You understand that we will not ordinarily grant a request for an advance that would cause the unpaid principal of your Account Balance to be greater than the Credit Limit, but that we may, at our option, grant such a request without obligating ourselves to do so in the future. Your Credit Limit will not be increased if you overdraw the Line of Credit. If you exceed the Credit Limit, you agree to immediately pay the amount by which the unpaid principal of your Account Balance exceeds the Credit Limit, even if we have not yet billed you. Any sums in excess of the Credit Limit will not be secured by the

Property, unless they are for accrued but unpaid interest or expenditures made pursuant to the security instrument securing the Property.

**7. Annual Percentage Rate (APR)**

**Variable Rate.**

This Line of Credit has a variable interest rate. The APR may change and will be based on the value of an index. The "Index Rate" will be the highest Prime Rate as published in the "Money Rates" table of The Wall Street Journal as of the first business day of the calendar month. To determine the APR, we will add a "Margin" of 2.125 percentage point(s) to the value of the Index.

The initial periodic rate that will be used to calculate the Finance Charge is the Daily Periodic Rate of 0.0290% and the corresponding APR of 10.625%. The APR includes interest and no other costs. The stated initial periodic rate and corresponding APR reflect the Index Rate plus the Margin as described in this section.

**Rate Changes.**

The initial periodic rate is the rate charged from the date of line funding though the first billing cycle or until the first Index increase or decrease. The APR may increase if the Index Rate increases. An Index Rate increase will result in higher finance charges, and it may have the effect of increasing your periodic Minimum Payment. A decrease in the Index Rate will have the opposite effect as an increase. An Index Rate increase or decrease will take effect on the date of the start of your next billing cycle as reflected in your periodic statement. The APR can increase or decrease monthly. If the Index Rate changes more frequently than the APR, we will continue to use the Index Rate in effect on of the first business day of the calendar month of the corresponding billing cycle for the remainder of your current billing cycle.

**Rate Change Limitations.**

APR changes are subject to limitations below. If this Agreement includes an initial discount rate, the lifetime floor listed below will not apply to such initial discounted rate. At the end of an initial discount rate period, the rate will increase to the then prevailing APR or the minimum APR, whichever is greater, regardless of any limitations on interest rate increases otherwise applicable under this Agreement.

**Lifetime Floor.** The minimum APR that can apply during the term of this line of Credit is 4.000%.

**Lifetime Cap.** The maximum APR that can apply during the term of this Line of Credit is 18.000% or the maximum APR allowed by applicable law, whichever is less.

**8. Finance Charges.**

Finance charges begin to accrue immediately when we make an advance to you. Finance charges will accrue on an actual 365-day year basis (366-day year basis for leap year) Finance charges will be computed as follows:

The Finance Charge for each monthly billing period is determined by using the following simple interest rate calculation. A Finance Charge is calculated daily on the daily principal balance by multiplying the daily periodic rate by the daily principal balance.

The daily periodic rate is calculated by dividing the annual percentage rate by 365 (366 for leap year).

To get the daily principal balance we (i) take the beginning principal balance for that day (ii) add to that amount all advances, if any, then (iii) subtract all principal balance payments and credits that apply to debt repayment and add any unpaid finance charges, fees and charges. All of the daily principal balance Finance Charges for the

monthly billing cycle are added together to get the total daily principal balance Finance Charge for the monthly billing cycle.

**Other Fees and Charges.** I understand that I may also be responsible for the following additional fees and charges:

**Fees Due at Closing:**

Loan Origination Fee   $1,617.00 ( 3.000% of the line amount)

The amount of the initial draw deposited to your Account will be reduced by the amount of the Loan Origination Fee.

**Fees Due During the Term of the Agreement:**

- Annual Maintenance Fee $ 50.00 to be charged at the one year anniversary of the Agreement Date and every year thereafter during your Draw Period.
- 15 days after the due date a Late Fee of 10.000% of the overdue monthly principal and interest payment (or interest payment if the overdue payment only consists of interest) will be charged. Late period and/or charge may vary as required by state law.
- If a check or any other instrument or payment method with which you have made a payment on the Account is returned to us unpaid for any reason, you will be charged a return payment charge of $30.00.

To the extent a state law imposes a maximum on any of the charges imposed under this Section 8: Fees Due During the Term of the Agreement, we will charge you the amount specified in this Agreement, or the maximum permitted by state law, whichever is less.

**Fees Due at Termination:**

- Termination Fee:  N/A

**Charges to Your Account.**

We may charge your Account to pay other fees and costs that you are obligated to pay under this Line of Credit or under the instrument securing this Agreement. In addition, we may charge your Account for funds required for continuing required insurance coverage or costs to protect or perfect our security interest in the Property. Any amount so charged to your Account will be an advance on which finance charges will accrue. However, we have no obligation to provide any of the advances referred to herein. To the extent a state law imposes a maximum on any of the charges imposed under this Section 8, we will charge you the amount specified in this Agreement or the maximum permitted by state law, whichever is less.

**9. Payment Terms.**

**Payment Due Date.**

During the term of this Agreement, a Minimum Payment will be due on or before the Payment Due Date for any Billing Cycle in which there is an outstanding balance. Your Minimum Payments will be due monthly beginning on the first Payment Due Date as provided in your periodic statement.

**Late Charges.**

If your payment is more than 15 days after the due date a Late Fee of 10.000% of the overdue monthly principal and interest payment (or interest payment if the overdue payment only consists of interest) will be charged. Late period and/or charge may vary as required by state law.

**Returned Payment Charge.**

If a check or any other instrument or payment method with which you have made a payment on the Account is returned to us unpaid for any reason, you will be charged a return payment charge of $30.00.

## 10. Minimum Payments

On or before each Payment Due Date, you agree to make a payment of at least the Minimum Payment amount. Periodic Minimum Payments are required during the Draw Period, Interest Only Period, and Repayment Period.

**During the Draw Period and Interest Only Period,** you promise to pay the:

Minimum Payment, which will equal the greater of (a) $100.00; or (b) the sum of all accrued finance charges and other charges for the Billing Cycle and shall be due and payable on the date shown on the monthly statement. If your Account Balance on a Payment Due Date is less than the Minimum Payment amount, you must pay only the amount necessary to reduce your Account Balance to zero.

If for any reason, the balance exceeds your maximum Credit Limit, the amount over your maximum Credit Limit will also be due in addition to your Minimum Payment. There may be other charges described in this Agreement that you will be obligated to pay. You agree that our books and records will be sufficient evidence of your obligations to us under this Agreement.

**During the Repayment Period,** payments will be due monthly. Your minimum monthly payment will equal the greater of (a) $100.00; or (b) 1/240th of your outstanding Account Balance at the end of the Draw Period, plus all accrued finance charges and other fees, charges and costs. We will calculate this amount by taking the outstanding Account Balance on the last day of the Draw Period and dividing it by 240 months and then adding any finance charges that accrues but remains unpaid during the Billing Cycle plus any other fees, charges and costs to the fixed principal payment that is due. If your Account Balance on a Payment Due Date is less than the Minimum Payment amount, you must pay only the amount necessary to reduce your Account Balance to zero. On the Maturity Date, you must pay the entire outstanding Account Balance. If you make extra outstanding principal balance payments, such payments will not extend or postpone the due date of monthly Minimum Payments or reduce the amount of future fixed principal payments.

## 11. Principal Reduction.

**Draw Period.** During the Draw Period, the Minimum Payment (Interest Only) will not reduce the principal balance outstanding on your Account Balance.

**Repayment Period.** During the Repayment Period, the Minimum Payment may not, to the extent permitted by law, fully repay the principal balance outstanding on your Account Balance.

## 12. Final Payment.

On the Maturity Date listed in this Agreement, you must pay any remaining Account Balance outstanding. You will be required to pay the entire outstanding balance in a single payment.

We are not obligated to refinance your Line of Credit at that time but will consider your request to do so. If you refinance this Line of Credit at maturity, you may have to pay some, or all of the closing costs normally associated with such refinancing even if you obtain financing from us.

## 13. Additional Payment Terms.

You can pay off all or part of what you owe at any time. Paying more than the Minimum Payment amount does not advance your payment due date. You must continue to make your periodic Minimum Payments as otherwise required by this Agreement.

Unless otherwise required by law, we will apply all payments and credits to finance charges, other fees, charges, and expenses, principal, and other amounts due under this Agreement in any order we choose, without notice. No late charge will be assessed on any payment when the only delinquency is due to late fees assessed on earlier payments and the payment is otherwise a full payment.

**14. Periodic Statements.**

If you have an outstanding balance of $1.00 or greater on your Line of Credit or have any Line of Credit activity, we will send you a periodic statement at the end of each Billing Cycle. This periodic statement will reflect, among other things, credit advances, finance charges, other charges, payments made, other credits, your previous Account Balance and your new Account Balance. The periodic statement will also identify your Minimum Payment for the cycle and the Payment Due Date.

**15. Property Insurance.**

This Line of Credit requires homeowner's insurance on the property, which you may obtain from a company of your choice that we find acceptable. You promise to insure the Property in the amount, to the extent, and for the periods we require against fire and other hazards (including flood, wind, and other hazards, if we require). You promise to name us as a loss payee under the policy(ies). If we request it, you agree to deliver to us a copy of the policy(ies) and proof that all premiums have been paid in full. Subject to applicable law, if you fail to obtain or maintain insurance as required, we may purchase insurance to protect our own interest, add the premium(s) to your Account Balance and/or pursue any other remedies available to us.

In the event that the subject property is located in a special flood hazard area, flood insurance will also be required.

**16. Termination.**

You may terminate this Line of Credit at any time upon written notice to us. Termination by one Borrower terminates the Line of Credit for all Borrowers. Termination will not affect your obligation to repay advances made before the termination, nor will it alter your duties to perform under the terms of an instrument securing this Agreement until such instrument is released.

**17. Waivers of Consent.**

To the extent not prohibited by law and except for any required notice of right to cure for the failure to make a required payment, you waive protest, presentment for payment, demand, notice of acceleration, notice of intent to accelerate and notice of dishonor. To the extent not prohibited by law, you and any other party to this Line of Credit also consent to the following actions that we may take, and waive defenses that may be available based on these actions, or based on the status of a party to this Line of Credit:

- We may renew or extend payments on this Agreement, regardless of the number of such renewals or extensions. We may release any Borrower or other person who may be liable for the indebtedness under this Agreement.
- We may release, substitute, or impair any Property securing this Agreement. We may invoke our right of set-off.
- We may enter into any sales or repurchases of this Agreement to any person in any amounts and you waive notice of such sales or repurchases.
- You agree that any Borrower is authorized to modify the terms of this Agreement or any other Line of Credit document.

- We may inform any party who guarantees this Line of Credit of any accommodations, renewals, extensions, modifications, substitutions or future advances.
- No delay or forbearance on our part in exercising any of our rights or remedies will be construed as a waiver by us, unless such waiver is in writing and is signed by us.

## 18. Integration and Severability.

This Agreement is the complete and final expression of our agreement. If any provision(s) of this Agreement is/ are unenforceable, then the unenforceable provision(s) will be severed, and the remaining provisions will still be enforceable.

## 19. Notices, Periodic Reviews, Financial Reports and Additional Documents.

Unless otherwise required by law, any notice will be given by delivering it or mailing it by first class mail to the Property Address above, or to any other address designated in writing. Notice to one Borrower will be deemed to be notice to all Borrowers. You will inform us in writing of any change in your name, address or other application information. Your Line of Credit will be subject to periodic reviews to ensure that our program requirements are still being met. Such periodic reviews may include, but are not limited to, obtaining and reviewing updated credit reports, obtaining and reviewing updated collateral values, and obtaining property condition reports. You agree that we may obtain a credit report for updates, renewals, extensions, and collection activity with respect to your Line of Credit (at your request, we will tell you whether we obtained a credit report and, if so, the name and address of the consumer reporting agency that provided it). You also agree to supply us with whatever information we reasonably feel is necessary to decide whether to continue this Line of Credit. We will make requests for this information without undue frequency and will give you reasonable time in which to supply the information. All financial statements and information you give us will be correct and complete. You agree to sign, deliver, and file any additional documents or certifications that we may consider necessary to perfect, continue and preserve your obligations under this Line of Credit and to confirm our lien status on any Property. Time is of the essence.

## 20. Tax Deductibility.

You should consult a tax advisor regarding the deductibility of interest and charges under this Agreement.

## 21. Default.

If you default on the terms of this Agreement, we may terminate your Line of Credit and accelerate your payments. Once terminated, your Account cannot be reinstated. In order to obtain a new line of credit you must reapply and qualify based on our current program requirements.

You will be in default if any of the following occur:

- You fail to make a payment as required by this Agreement.
- Your action or inaction adversely affects the Property or our rights in the Property.
- You engage in fraud or material misrepresentation in connection with this Line of Credit.
- You otherwise breach the terms of this Agreement.

## 22. Suspension of Credit and Reduction of Credit Limit.

We may temporarily prohibit you from obtaining additional advances or reduce your Credit Limit during any period in which any of the following are in effect:

- The value of the Property securing this Line of Credit declines significantly below its appraised value for purposes of this Line of Credit.

- We reasonably believe that you will not be able to meet the repayment requirements under this Agreement due to a material change in your financial circumstances.
- You are in default of a material obligation under this Line of Credit. You understand that we consider all of your obligations to be material. Categories of obligations that we consider material include, but are not limited to: your obligation to not commit fraud or misrepresentation in connection with this Line of Credit; your obligation to meet the repayment terms of this Line of Credit; your obligation to not adversely affect the Property or our rights in the Property; your obligation to pay fees and charges; your advance obligations; your obligation to fulfill the terms of the instrument securing this Agreement, and any other security instruments on the Property; your obligation to notify us; and your obligation to provide us with information.
- Government action prevents us from imposing the annual percentage rate provided for in this Agreement.
- The priority of our security interest is adversely affected by government action to the extent that the value of the security interest is less than 120 percent of your Credit Limit.
- The maximum annual percentage rate allowed under this Agreement is reached.
- We are notified by a regulatory agency that continued advances constitute an unsafe and unsound practice.
- Any Borrower requests a suspension of credit privileges.

In order to reinstate your credit privileges under the original terms of this Agreement, you must send us a written request to that effect. Your credit privileges will only be reinstated if we determine that the condition that caused us to prohibit additional extensions and/or reduce the Credit Limit no longer exists. If appraisal or credit report fees are incurred in making this determination, we may charge you such fees if allowed by applicable law. If credit privileges were suspended at your request, they need not be reinstated unless all Borrowers request reinstatement.

## 23. Remedies.

After you default, and/or we suspend or reduce your credit limit and subsequently give any legally required notice and opportunity to cure, we may at our option do any of the following:

- We may terminate this Line of Credit and make all or any part of the amount owing by the terms of this Agreement immediately due.
- We may temporarily or permanently prohibit any additional advances.
- We may temporarily or permanently reduce the Credit Limit.
- We may demand additional security or additional parties to be obligated to pay this Agreement.
- We may make a claim for any and all insurance benefits or refunds that may be available on your default.
- We may make amounts advanced on your behalf immediately due, and we may add these amounts to the Account Balance.
- We may use any and all remedies we have under applicable law or any agreement securing this Agreement.

Except as otherwise required by law, by choosing a remedy, we do not give up our right to use another remedy. We do not waive a default if we choose not to use a remedy. By electing not to use any remedy, we neither waive our right to later consider the event a default, nor to use any remedies if the default continues or occurs again.

## 24. Collection Expense and Attorney's Fees.

On or after default, to the extent permitted by law, you agree to pay all expenses of collection, enforcement or protection of our rights and remedies under this Line of Credit. Expenses include, but are not limited to, attorneys' fees, court costs and other legal expenses. To the extent permitted by the United States Bankruptcy

Code, you agree to pay the reasonable attorneys' fees we incur to collect this debt as awarded by any court exercising jurisdiction under the Bankruptcy Code.

### 25. Obligations of Persons Under this Agreement.

Your obligation to pay this Line of Credit is independent of the obligation of any other person who has also agreed to pay it. If more than one person signs this Agreement, each person is fully and personally obligated to keep all of the promises made in this Agreement, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Agreement is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Agreement is also obligated to keep all of the promises made in this Agreement. The Lender or holder of the Agreement may enforce its rights under this Agreement against each person individually or against all of you together. Any extension of, or new obligations under, this Line of Credit will not affect your duty or obligation to pay. This means that any one of you may be required to pay all of the amounts owed under this Agreement.

### 26. Set-Off.

We may set off any amount due and payable under the terms of this Agreement against your right to receive money from us, unless prohibited by applicable law.

### 27. Change in Terms.

Generally, the terms of this Agreement cannot be changed. We may, however, make the following changes:

- Changes that you agree to in writing at the time of the change;
- Changes that will unequivocally benefit you throughout the remainder of the Agreement;
- Insignificant changes to terms; or
- Change the index and margin used under the Agreement if the original index becomes unavailable. Any new index will have a historical movement substantially similar to that of the original index, and together with the new margin, produce an annual percentage rate substantially similar to the rate in effect at the time the original index became unavailable.

If we are required to send notice of a change in terms, we will send the notice to your address listed above.

### 28. Applicable Law.

This Agreement is governed by the laws of PENNSYLVANIA, the United States of America, and to the extent required, by the laws of the jurisdiction where the Property is located.

### 29. Use of Account.

You promise to use advances under the Line of Credit for consumer (personal, family or household) purposes, unless we give you written permission to use the Account for agricultural or commercial purposes or to purchase real estate.

### 30. Assignment.

We may freely assign this Agreement and all our obligations and rights thereunder by any means permitted by law. The assignee, successor-in-interest, or beneficiary will have all rights under this Agreement, including, without limitation, the right to enforce the Agreement against you, any Borrower, and any guarantor.

### 31. State Notice.

Any provision that appoints us as an agent is not subject to the provisions of 20 Pa.C.S.A. Section 5601 et seq. (Chapter 56; Decedents, Estates and Fiduciaries Code). By exercising any of our rights under this Agreement, we do so for our sole benefit.

BY SIGNING BELOW, YOU AGREE TO THE TERMS OF THIS AGREEMENT. YOU ALSO ACKNOWLEDGE AND AGREE THAT YOU RECEIVED A COMPLETED COPY OF THIS AGREEMENT.

Date: 3/26/24

KERRY ANN HANSON

## YOUR BILLING RIGHTS - KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

### NOTIFY US IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR BILL

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us (on a separate sheet) at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us but doing so will not preserve your rights.

In your letter, give us the following information:

- Your name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

### YOUR RIGHTS AND OUR RESPONSIBILITIES AFTER WE RECEIVE YOUR WRITTEN NOTICE

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

### SPECIAL RULE FOR CREDIT CARD PURCHASES

If you have a problem with the quality of goods or services that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may not have to pay the remaining amount due on the goods or services.

There are two limitations on this right:

a. You must have made the purchase in your home state or, if not within your home state within 100 miles of your current mailing address; and
b. The purchase price must have been more than $50.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

Date: March 26, 2024
Borrower: HANSON

# <u>ATTENTION NOTARY!!</u>

## Please use Blue or Black Ink for Closing

### SCANBACKS ARE REQUESTED ON THIS FILE

SECURELY UPLOAD SCANBACKS TO THE ZIGSIG/SMART-E-NOTARY PORTAL BY:
VIEWING THE ORDER DETAILS PAGE AND NAVIGATING TO THE "SCANBACK" TAB
UPLOAD 1 OR MULTIPLE FILES
RELEASE ALL SCANS BY PRESSING "ALL DOCS UPLOADED"

## RETURNING DOCS:

SIGNED LOAN DOCUMENTS MUST BE RETURNED TO OUR OFFICE
WITHIN **24 HOURS** OF SIGNATURE USING THE LABEL PROVIDED



**EXHIBIT C**

**Prepared By: Shavonna Eckford**
LoanDepot.com LLC
6531 Irvine Center Dr Ste 100
Irvine, CA 92618-2145

**When Recorded Return To:**
LoanDepot.com LLC
6531 Irvine Center Dr Ste 100
Irvine, CA  92618-2145
(949) 470-6569

MERS Phone: 1-888-679-6377

**ASSIGNMENT FROM MERS**
**Assignment of Mortgage**

For Value Received, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE
FOR LOANDEPOT.COM, LLC, Its successors and assigns whose address is 1901 E. VOORHEES
ST., SUITE C, DANVILLE, IL  61834, hereby assigns and transfers to LOANDEPOT.COM, LLC,
whose address is 6561 IRVINE CENTER DRIVE, IRVINE, CA 92618, all of its right, title and interest
in the below described mortgage

Mortgagor: KERRY ANN HANSON
Original Mortgagee: Mortgage Electronic Registration Systems, Inc. as Nominee for LoanDepot.
com, LLC
Date of Mortgage: March 26, 2024
Note Amount: $53,900.00
Date of Recorded: April 08, 2024,   Instrument No. 54286955
Parcel ID: 35223420
*THIS ASSIGNMENT IS NOT SUBJECT TO THE REQUIREMENTS OF SEC. 275 OF REAL PROPERTY
LAW BECAUSE IT IS AN ASSIGNMENT WITHIN THE SECONDARY MORTGAGE MARKET*

IN WITNESS WHEREOF, the said MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.,
AS NOMINEE FOR LOANDEPOT.COM, LLC, by the officer duly authorized, has executed the

foregoing instrument of the 3rd   day of September, 2025  .

Maria Pineda, Assistant Secretary of MERS

## ACKNOWLEDGEMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California, County of Orange

On September 03, 2025  before me, Christian DeOcampo, a Notary Public,  personally appeared Maria Pineda, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify that under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

CHRISTIAN DEOCAMPO
Notary Public - California
Orange County
Commission # 2389001
My Comm. Expires Jan 1, 2026

Electronically Notarized in Person via Simplifile
2389001

Christian DeOcampo
Notary Public in and for the State of California
Residing at Orange County

My appointment expires: January 01, 2026

# EXHIBIT "A"

### Legal Description

The following described property located in the County of Philadelphia, State of Pennsylvania: All that certain lot or piece of ground with the buildings and improvements thereon erected, situate in the Thirty-Fifth Ward of the City of Philadelphia and described according to a survey and plan thereof made by Ernest R. Brooks, Esquire, Surveyor and Regulator of Eighth District, dated the 12 day of DECEMBER, 1950, as follows, to wit: Beginning at a point on the Northwesterly side of Reach Street At the distance of Sixty-Five feet Eight and One-Quarter inches measured on the arc of a circle curving to the left having a radius of Fifty feet along the said side of Reach Street from a point of compound curve on the Northeasterly side of Howell Street (Fifty Feet wide), said point of compound curve being at the distance of One Hundred and Seventy-Eight feet Three and Three-Quarters inches measured on the arc of a circle curving to the left having a radius of Three Hundred and Eighty-Eight feet Eleven and One-Eighth inches along the said side of Howell Street from a point of curve in the same, said point of curve being at the distance of Three Hundred and fifty feet Southeastwardly measured along the said side of Howell Street from the Southeasterly side of Newtown Avenue (Sixty Feet wide) thence extending North Fifty-One degrees Eleven minutes Twenty-Two seconds West partly through the center of the party wall, One Hundred and Six feet Five and Seven-Eighths inches to a point in the center line of a certain Fifteen Feet wide driveway, said driveway extending from Howell Street to Comly Street, said driveway also communicating with another certain Fifteen Feet wide driveway leading Northwestwardly into Newtown Avenue; thence extending North Thirty-Eight degrees Forty-Eight minutes Thirty-Eight seconds East along the center line of the first above mentioned Fifteen Feet wide driveway, Nineteen feet Nine inches to a point; thence extending South Fifty-One degrees Eleven minutes Twenty-Two seconds East partly through the center of the party wall, Ninety-Seven feet Eight and One-Quarter inches to a point on the Northwesterly side of Reach Street aforesaid, thence extending along the said side of Reach Street on the arc of a circle curving to the right having radius of Fifty feet, the arc distance of Twenty-One feet Nine and One-Half inches to the first mentioned point and place of beginning. Together with the free and common use, right, liberty and privilege of the aforesaid driveway, as and for driveways, passageways and watercourses at all times hereafter forever in common with the owners, tenants and occupiers of the other lots of ground bounding thereon and entitled to the use thereof.

## CERTIFICATE OF RESIDENCE OF ASSIGNEE

The below officer certifies that the principal business and mailing address for this assignment and assignee is:
PHFA, 211 NORTH FRONT STREET, HARRISBURG, PA 17101

_S. Eckford_

Shavonna Eckford

Case 25-13426-djb   Doc 34-3   eFiled 04/08/2024 Entered PA1/08/24 15:28:585   Desc
Exhibit Page 17 of 26   Page 1 of 9   Rec Fee: $244.75
Receipt#: 24-26786
Records Department   Doc Code: M

After recording please return to:
loanDepot.com, LLC
ATTN: HELOC – DOC CONTROL
6531 Irvine Center Drive, Suite 100
Irvine, CA 92618

This instrument was prepared by:
loanDepot.com, LLC
6561 Irvine Center Drive
Irvine, CA 92618



*EXHIBIT B*

Uniform Parcel Identifier Number ████████
Property Address: 5976 REACH ST, PHILADELPHIA, PENNSYLVANIA 19120

[Space Above This Line For Recording Data]

HANSON
████████████████

## OPEN-END MORTGAGE
(Line of Credit)

**NOTICE TO BORROWER: This document contains provisions for a variable interest rate.**

THIS OPEN-END MORTGAGE, dated March 26, 2024, is between KERRY ANN HANSON, AS SOLE OWNER residing at 5976 REACH ST, PHILADELPHIA, PENNSYLVANIA 19120, the person or persons signing as "Mortgagor(s)" below and hereinafter referred to as "we" or "us" and Mortgage Electronic Registration Systems, Inc., with a mailing address of P.O. Box 2026, Flint, MI 48501-2026, and a street address of 11819 Miami Street, Suite 100, Omaha, NE 68164, tel. (888) 679- MERS, solely as nominee for loanDepot.com, LLC, hereinafter called "Lender" (and Lender's successors and assigns) which has the address of 6561 Irvine Center Drive, Irvine, CA 92618 and hereinafter referred to as "you" or the "Mortgagee."

MORTGAGED PREMISES: In consideration of the loan hereinafter described and intending to be legally bound, we hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns), the premises located at: 5976 REACH ST (Street) PHILADELPHIA (City), PHILADELPHIA (County), PENNSYLVANIA (State) 19120 (Zip) (the "Premises") and further described as:

THE FOLLOWING DESCRIBED PROPERTY LOCATED IN THE COUNTY OF PHILADELPHIA, STATE OF PENNSYLVANIA: ALL THAT CERTAIN LOT OR PIECE OF GROUND WITH THE BUILDINGS AND IMPROVEMENTS THEREON ERECTED, SITUATE IN THE THIRTY-FIFTH WARD OF THE CITY OF PHILADELPHIA AND DESCRIBED ACCORDING TO A SURVEY AND PLAN THEREOF MADE BY ERNEST R. BROOKS, ESQUIRE, SURVEYOR AND REGULATOR OF EIGHTH DISTRICT, DATED THE 12 DAY OF DECEMBER, 1950, AS FOLLOWS, TO WIT: BEGINNING AT A POINT ON THE NORTHWESTERLY SIDE OF REACH STREET AT THE DISTANCE OF SIXTY-FIVE FEET EIGHT AND ONE-QUARTER INCHES MEASURED ON THE ARC OF A CIRCLE CURVING TO THE LEFT HAVING A RADIUS OF FIFTY FEET ALONG THE SAID SIDE OF REACH STREET FROM A POINT OF COMPOUND CURVE ON THE NORTHEASTERLY SIDE OF HOWELL STREET (FIFTY FEET WIDE), SAID POINT OF COMPOUND CURVE BEING AT THE DISTANCE OF ONE HUNDRED AND SEVENTY-EIGHT FEET THREE AND THREE-QUARTERS INCHES MEASURED ON THE ARC OF A CIRCLE CURVING TO THE LEFT HAVING A RADIUS OF THREE HUNDRED AND EIGHTY-EIGHT FEET ELEVEN AND ONE-EIGHTH INCHES ALONG THE SAID SIDE OF HOWELL STREET FROM A POINT OF CURVE IN THE SAME, SAID POINT OF CURVE BEING AT THE DISTANCE OF THREE HUNDRED AND FIFTY FEET SOUTHEASTWARDLY MEASURED ALONG THE SAID SIDE OF HOWELL STREET FROM THE SOUTHEASTERLY SIDE OF NEWTOWN AVENUE (SIXTY FEET WIDE) THENCE EXTENDING NORTH FIFTY-ONE DEGREES ELEVEN MINUTES TWENTY-TWO SECONDS WEST PARTLY THROUGH THE CENTER OF THE PARTY WALL, ONE HUNDRED AND SIX FEET FIVE AND SEVEN-EIGHTHS INCHES TO A POINT IN THE CENTER LINE OF A CERTAIN FIFTEEN FEET WIDE DRIVEWAY, SAID DRIVEWAY EXTENDING FROM HOWELL STREET TO COMLY STREET, SAID DRIVEWAY ALSO COMMUNICATING WITH ANOTHER CERTAIN FIFTEEN FEET WIDE DRIVEWAY LEADING NORTHWESTWARDLY INTO NEWTOWN AVENUE; THENCE EXTENDING NORTH THIRTY-EIGHT DEGREES FORTY-EIGHT MINUTES THIRTY-EIGHT SECONDS EAST ALONG THE CENTER LINE OF THE FIRST ABOVE MENTIONED FIFTEEN FEET WIDE DRIVEWAY, NINETEEN FEET NINE INCHES TO A POINT; THENCE EXTENDING SOUTH FIFTY-ONE DEGREES ELEVEN MINUTES TWENTY-TWO SECONDS EAST PARTLY THROUGH THE CENTER OF THE PARTY WALL, NINETY-SEVEN FEET EIGHT AND ONE-QUARTER INCHES TO A POINT ON THE NORTHWESTERLY SIDE OF REACH STREET AFORESAID, THENCE EXTENDING ALONG THE SAID SIDE OF REACH STREET ON THE ARC OF A CIRCLE CURVING TO THE RIGHT HAVING RADIUS OF FIFTY FEET, THE ARC DISTANCE OF TWENTY-ONE FEET NINE AND ONE-HALF INCHES TO THE FIRST MENTIONED POINT AND PLACE OF BEGINNING. TOGETHER WITH

THE FREE AND COMMON USE, RIGHT, LIBERTY AND PRIVILEGE OF THE AFORESAID DRIVEWAY, AS AND FOR DRIVEWAYS, PASSAGEWAYS AND WATERCOURSES AT ALL TIMES HEREAFTER FOREVER IN COMMON WITH THE OWNERS, TENANTS AND OCCUPIERS OF THE OTHER LOTS OF GROUND BOUNDING THEREON AND ENTITLED TO THE USE THEREOF.

The Premises includes all buildings and other improvements now or in the future on the Premises and all rights and interests which derive from our ownership, use or possession of the Premises and all appurtenances thereto, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all streets, lanes, alleys, passages, and ways; all easements, rights of way, all liberties, privileges, tenements, hereditaments, and appurtenances thereunto belonging or anywise made appurtenant hereafter, and the reversions and remainders with respect thereto.

THIS MORTGAGE SECURES FUTURE ADVANCES UP TO A MAXIMUM INDEBTEDNESS OF $53,900.00, EXCLUSIVE OF INTEREST AND EXCLUSIVE OF ADVANCES THAT MAY BE MADE BY YOU UNDER THE PROVISIONS OF THE SECTION OF THIS MORTGAGE ENTITLED "OUR AUTHORITY TO YOU."

Borrower understands and agrees that MERS holds only legal title to the interests granted by Mortgagor in this Mortgage; but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns), has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Premises; and to take any action required of Lender including, but not limited to, releasing or canceling this Mortgage.

LOAN: The Mortgage will secure the loan we received in the principal amount of $53,900.00 or so much thereof as may be advanced and readvanced from time to time to KERRY ANN HANSON, the Borrower(s) under the Home Equity Line of Credit Agreement and Disclosure Statement (the "Agreement") dated March 26, 2024, plus interest and costs, late charges and all other charges related to the loan, all of which sums are repayable according to the Agreement, which has a maturity date of March 26, 2054. This Mortgage will also secure the performance of all of the promises and agreements made by us and each Borrower and Co-Signer in the Agreement, all of our promises and agreements in this Mortgage, any extensions, renewals, amendments, supplements and other modifications of the Agreement, and any amounts advanced by you under the terms of the section of this Mortgage entitled "Our Authority To You." Loans under the Agreement may be made, repaid and remade from time to time in accordance with the terms of the Agreement and subject to the Credit Limit set forth in the Agreement.

RIDERS: The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ 1-4 Family Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Planned Unit Development Rider | ☐ Other(s) (specify): | |

OWNERSHIP: We are the sole owner(s) of the Premises. We have the legal right to mortgage the Premises to you.

MORTGAGOR'S IMPORTANT OBLIGATIONS:

(a) TAXES: We will pay all real estate taxes, assessments, water charges and sewer rents relating to the Premises when they become due. We will not claim any credit on, or make deduction from, the loan under the Agreement because we pay these taxes and charges. We will provide you with proof of payment upon request.

(b) MAINTENANCE: We will maintain the building(s) on the Premises in good condition. We will not make major changes in the building(s) except for normal repairs. We will not tear down any of the building(s) on the Premises without first getting your consent. We will not use the Premises illegally. If this Mortgage is on a unit in a condominium or a planned unit development, we shall perform all of our obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development and constituent documents.

(c) INSURANCE: We will keep the building(s) on the Premises insured at all times against loss by fire, flood and any other hazards you may specify. We may choose the insurance company, but our choice is subject to your reasonable approval. The policies must be for at least the amounts and the time periods that you specify. We will deliver to you upon your request the policies or other proof of the insurance. The policies must name you as "mortgagee" and "loss-payee" so that you will receive payment on all insurance claims, to the extent of your interest under this Mortgage, before we do. The insurance policies must also provide that you be given not less than 10 days prior written notice of any cancellation or reduction in coverage, for any reason. Upon request, we shall deliver the policies, certificates or other evidence of insurance to you. In the event of loss or damage to the Premises, we will immediately notify you in writing and file a proof of loss with the insurer. You may file a proof of loss on our behalf if we fail or refuse to do so. You may also sign our name to any check, draft or other order for the payment of insurance proceeds in the event of loss or damage to the Premises. If you receive payment of a claim, you will have the right to choose to use the money either to repair the Premises or to reduce the amount owing on the Agreement.

(d) CONDEMNATION: We assign to you the proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Premises, or part thereof, or for conveyance in lieu of condemnation, all of which shall be paid to you, subject to the terms of any mortgages that have priority to this Mortgage.

(e) SECURITY INTEREST: We will join with you in signing and filing documents and, at our expense, in doing whatever you believe is necessary to perfect and continue the perfection of your lien and security interest in the Premises.

(f) OUR AUTHORITY TO YOU: If we fail to perform our obligations under this Mortgage, you may, if you choose, perform our obligations and pay such costs and expenses. You will add the amounts you advance to the sums owing on the Agreement, on which you will charge interest at the interest rate set forth in the Agreement. If, for example, we fail to honor our promises to maintain insurance in effect, or to pay filing fees, taxes or the costs necessary to keep the Premises in good condition and repair or to perform any of our other agreements with you, you may, if you choose, advance any sums to satisfy any of our agreements with you and charge us interest on such advances at the interest rate set forth in the Agreement. This Mortgage secures all such advances. Your payments on our behalf will not cure our failure to perform our promises in this Mortgage. Any replacement insurance that you obtain to cover loss or damages to the Premises may be limited to the amount owing on the Agreement plus the amount of any mortgages that have priority to this Mortgage.

(g) HAZARDOUS SUBSTANCES: We shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Premises. We shall not do, nor allow anyone else to do, anything affecting the Premises that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Premises of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Premises. As used in this paragraph, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph, "Environmental Law" means federal laws and laws of the jurisdiction where the Premises are located that relate to health, safety or environmental protection.

(h) SALE OF PREMISES: We will not sell, transfer ownership of, mortgage or otherwise dispose of our interest in the Premises, in whole or in part, or permit any other lien or claim against the Premises without your prior written consent.

(i) INSPECTION: We will permit you to inspect the Premises at any reasonable time.

NO LOSS OF RIGHTS: The Agreement and this Mortgage may be negotiated or assigned by you without releasing us or the Premises. You may add or release any person or property obligated under the Agreement and this Mortgage without losing your rights in the Premises.

REMOVAL OF IMPROVEMENTS: We shall not demolish or remove any improvements from the Premises without your prior written consent. As a condition to the removal of any improvements, you may require us to make arrangements satisfactory to you to replace such improvements with improvements of at least equal value.

COMPLIANCE WITH GOVERNMENTAL REQUIREMENTS: We shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all

governmental authorities applicable to the use or occupancy of the Premises. We may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as we have notified you in writing prior to doing so and so long as, in your sole opinion, your interests in the Premises are not jeopardized. You may require us to post adequate security or a surety bond, reasonably satisfactory to you, to protect your interest.

DUTY TO PROTECT: We agree to neither abandon nor leave unattended the Premises. We shall do all other acts set forth above in this section, which from the character and use of the Premises are reasonably necessary to protect and preserve the Premises.

COMPLIANCE WITH LAWS: We warrant that the Premises and our use of the Premises complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

SURVIVAL OF PROMISES: All promises, agreements and statements we have made in this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature and shall remain in full force and effect until such time as the Agreement is paid in full.

DEFAULT: Except as may be prohibited by applicable law, and subject to any notice required by applicable law, if we default on any term in the Agreement and/or of any term of this Mortgage, you may, in accordance with applicable law, pursue and enforce any rights you have under applicable law, including, without limitation, the right to: (i) accelerate all amounts due under the Agreement; (ii) foreclose upon this Mortgage and sell the Premises, either in whole or in part or in separate parcels at different times, if necessary, until the indebtedness due under the Agreement is satisfied or the Premises is exhausted, whichever occurs first; (iii) enter on and take possession of the Premises; (iv) collect the rental payments, including over-due rental payments, directly from tenants, and you are appointed as our agent and attorney-in-fact to collect any such rents by any appropriate proceeding; (v) manage the Premises, including signing, canceling and changing leases; and (vi) seek appointment of a receiver for the Premises and we hereby appoint you as our attorney-in-fact with authority to consent for us to the appointment of a receiver. This means that, among other rights you may pursue and enforce, you may arrange for the Premises to be sold, as provided by law, in order to pay off what we owe under the Agreement and under this Mortgage. If the money you receive from the sale is not enough to pay off what we owe you, we will still owe you the difference which you may seek to collect from us in accordance with applicable law. We agree that the interest rate set forth in the Agreement will continue before and after a default, entry of a judgment and foreclosure. Subject to applicable law, if you acquire the Premises at a forced sale following our default, our right to any insurance proceeds resulting from damage to the Premises prior to the acquisition shall pass to you to the extent of the sums secured by this Mortgage immediately prior to acquisition. In addition, subject to applicable law, you shall be entitled to collect all reasonable fees and costs actually incurred by you or your agents arising out of or related to this Mortgage or the Agreement, including, but not limited to, reasonable attorneys' fees and costs of foreclosure, property preservation, documentary evidence, abstracts and title reports. We

will fulfill our obligations under this Mortgage and pay you back for any reasonable expenses paid by you both before and after any Survival Event as described below.

ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER: As additional security, we assign to you the rents of the Premises. You or a receiver appointed by the courts shall be entitled to enter upon, take possession of and manage the Premises and collect the rents of the Premises including those past due.

WAIVERS: To the extent permitted by applicable law, we waive and release any error or defects in proceedings to enforce this Mortgage and hereby waive the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale and homestead exemption.

SURVIVAL EVENTS: For purposes of this Mortgage, "Survival Event" is defined as follows:
(a) Any default described in the Agreement;
(b) You requiring me/us to pay immediately the full amount of Principal which has not been paid and all the interest that I/we owe on that amount under the Agreement;
(c) You requiring immediate payment in full of all sums secured by this Mortgage;
(d) The Maturity Date as defined in the Agreement;
(e) The entry of any judgment against me/us under the Agreement; and
(f) The entry of any judgment under this Mortgage.

BINDING EFFECT: Each of us shall be fully responsible for all of the promises and agreements in this Mortgage. Until the Agreement has been paid in full and your obligation to make further advances under the Agreement has been terminated, the provisions of this Mortgage will be binding on us, our legal representatives, our heirs and all future owners of the Premises. This Mortgage is for your benefit and for the benefit of anyone to whom you may assign it. Upon payment in full of all amounts owing to you under the Agreement and this Mortgage, and provided any obligation to make further advances under the Agreement has terminated, this Mortgage and your rights in the Premises shall end.

NOTICE: Except for any notice required under applicable law to be given in another manner, (a) any notice to us provided for in this Mortgage shall be given by delivering it or by mailing such notice by regular first class mail addressed to us at the last address appearing in your records or at such other address as we may designate by notice to you as provided herein, and (b) any notice to you, including without limitation any notice under 42 Pa.C.S.A. Section 8143, shall be given by certified mail, return receipt requested, to your address at loanDepot.com, LLC, 6561 Irvine Center Drive, Irvine, CA 92618 or to such other address as you may designate by notice to us. Any notice provided for in this Mortgage shall be deemed to have been given to us or you when given in the manner designated herein.

RELEASE: Upon payment of all sums secured by this Mortgage and provided your obligation to make further advances under the Agreement has terminated, you shall

discharge this Mortgage without charge to us, except that we shall pay any fees for recording of a satisfaction of this Mortgage.

**GENERAL:** You can waive or delay enforcing any of your rights under this Mortgage without losing them. Any waiver by you of any provisions of this Mortgage will not be a waiver of that or any other provision on any other occasion.

We acknowledge receipt of a signed copy of this Mortgage.

THIS MORTGAGE has been signed by each of us under seal on the date first above written.

_____ [Seal]
KERRY ANN HANSON

State of _Pennsylvania_

County of _Philadelphia_

On this the _26_ day of _March_ , _2024_ , before me
_Kimberly White_ the undersigned officer, personally appeared KERRY ANN
HANSON known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to
the within instrument, and acknowledged that he/she/they executed the same for the purposes therein
contained.

> Commonwealth of Pennsylvania - Notary Seal
> KIMBERLY WHITE - Notary Public
> Philadelphia County
> My Commission Expires March 1, 2025
> Commission Number 1274898

_Kimberly White_
Notary Public

_Kimberly White_
Printed Name

(Seal)

My commission expires on: _3\1\2025_

CERTIFICATE OF RESIDENCE. I, the undersigned subscribing Agent of
the Mortgagee named within, do hereby certify that the correct address of the
said Mortgagee is 11819 Miami St., Suite 100, Omaha, NE 68164.

WITNESS MY HAND this _8th_ day of _April_ , _2024_

_[signature]_
Signature

_J. Cervantes_ _____ Agent of Mortgagee
Printed Name

| Creditor: | loanDepot.com, LLC |
|---|---|
| Debtor: | Kerry Ann Hanson |
| Case No.: | 25-13426 |
| Loan No.: | xxxxxx4896 |
| Our File No.: | xxxxxx4896 |
| Collateral: | 5976 Reach St<br>Philadelphia, PA  19120 |

**PAYMENTS RECEIVED**

Loan Status as of:     11/12/2025
Initial Due Date:        9/1/2025

| Date Received | Amount Received | Due Date | Amount Due | Late Charges/ NSF/Other | Paid Over/Short | Description | PCN Status |
|---|---|---|---|---|---|---|---|
|  | $      - | 9/1/2025 | $    438.16 | $     - | $    (438.16) | Payment Accrued |  |
|  | $      - | 10/1/2025 | $    438.16 | $     - | $    (438.16) | Payment Accrued |  |
|  | $      - | 11/1/2025 | $    424.04 | $     - | $    (424.04) | Payment Accrued |  |
| **Total:** | **$      -** |  | **$  1,300.36** | **$     -** | **$  (1,300.36)** |  |  |

| Delinquent Payments | | Days Delinquent: | | 73 |
|---|---|---|---|---|
| Month Due | P&I Due | Escrow Due | Stip Due | Total Due |
| 9/1/2025 | $   438.16 | $      - | $      - | $    438.16 |
| 10/1/2025 | $   438.16 | $      - | $      - | $    438.16 |
| 11/1/2025 | $   424.04 | $      - | $      - | $    424.04 |
| Delinquency | | | | $  1,300.36 |
| Less Suspense | | | | $      - |
| Total Delinquency | | | | $  1,300.36 |



EXHIBIT 1